FILED

07 SEP 11 PM 3:35

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY:                          DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL P. GUERIN,<br><br>                              Plaintiff,<br><br>            v.<br><br>JO ANNE B. BARNHART, Commissioner of<br>Social Security Administration,<br><br>                              Defendant. | Civil No.    06-CV-1183 BEN (CAB)<br><br>**ORDER DENYING PLAINTIFF'S<br>MOTION FOR SUMMARY JUDGMENT;<br>GRANTING DEFENDANT'S MOTION<br>FOR SUMMARY JUDGMENT**<br><br>**[Doc. ## 9, 12]** |

## I.  INTRODUCTION

Plaintiff Daniel P. Guerin ("Plaintiff" or "Guerin") applied for Social Security Disability Benefits alleging a disability due to a seizure disorder and the "effects" of a bipolar disorder. (Tr. 135).[1] His claim was denied initially and upon reconsideration. An Administrative Law Judge ("ALJ") held a hearing on December 14, 2004. (Tr. 447-516). Following the hearing, the ALJ denied the application in a written decision dated September 15, 2005. (Tr. 18-38). On March 9, 2005, the Appeals Council denied review. (Tr. 9-11). Plaintiff then brought this action.

Plaintiff filed a motion for summary judgment. [Doc. # 9]. Defendant filed an opposition and a cross-motion for summary judgment. [Doc. 12]. For the reasons that follow, this Court denies Plaintiff's motion and grants Defendant's motion.

---

[1]All references to the evidence are references to the page numbers in the Administrative Record filed with Defendant's Answer. [Doc. # 8].

06cv1183

## II.  FACTS

Plaintiff was born in 1967.  (Tr. 35).  He has a high school equivalence education.  His past work was classified as that of a maintenance laborer, masonry carrier, construction worker, warehouse worker, and book repairer.  (Tr. 34).  Plaintiff stopped working in March 2002 due to problems with concentration.  (Tr. 469, 502).  Immediately prior to the hearing, he was living at a board and care facility offered through the REACH program.  (Tr. 490-93).

### A.    Medical Evidence

Plaintiff alleges a long history of mental illness accompanied by alcohol and drug abuse.  On December 31, 2001, he was admitted to Scripps Mercy Hospital due to mental health and alcohol problems.  The records indicated alcohol abuse and withdrawal.  (Tr. 376).  After undergoing an alcohol detoxification program, Plaintiff was referred to San Diego County Psychiatric Hospital for psychiatric medication and further assessment.  (Tr. 20).  Plaintiff's records showed a history of withdrawal seizures and delirium tremens during detoxification.  Guerin did not have any prominent head trauma or chronic seizure disorder treated with medication.  He admitted binge drinking and complained of dysphoria and anxiety.  *Id.*  Plaintiff was cognitively intact, although somewhat destractible.  His intelligence and memory were grossly normal.  *Id.*  Claire Arment, M.D. ("Dr. Arment") diagnosed malingering to obtain Librium, and alcohol dependence.  *Id.*  She assessed Plaintiff Global Assessment Functioning ("GAF") at 60.

From September 2002 through March 2003, Plaintiff was seen at the University of California, San Diego, Outpatient Psychiatric Services/Gifford Clinic.  (Tr. 221-241).  His initial assessment form, dated September 9, 2002, described his problems as fear and anxiety.  (Tr. 241).  Plaintiff reported a suicide attempt two years prior to his admission.  *Id.*  He also reported seeking mental health treatment in March 2002 for depression because of "confusion" and "lapses of reasoning."  *Id.*  Plaintiff cited a family history of depression, schizophrenia and obsessive-compulsive disorder ("OCD").  (Tr. 246).

Plaintiff admitted heavy use of alcohol for the past ten years, as well as past use of multiple illegal drugs.  Plaintiff claimed to have difficulty remembering the specific amounts and frequency of his substance abuse, however.  The clinician noted that Guerin's reported seizures may have been related to alcohol withdrawal.  The mental status examination notes indicate that Plaintiff had good eye contact,

1  was friendly, and cooperative.  Plaintiff was slightly agitated but had full affect.

2       At his next appointment at the Gifford Clinic, on September 16, 2002, Plaintiff was agitated and

3  hostile, with anxious and angry mood.  (Tr. 239).  The clinician observed Plaintiff to exhibit tangential

4  thought processes, passive suicidal ideation and some visual hallucinations.  *Id.*  The working diagnoses

5  were ETOH[2] dependency, OCD provisional, panic provisional, and psychotic disorder NOS.  Plaintiff's

6  GAF was assessed at 42.  *Id.*  During his appointment on September 23, 2002, Plaintiff showed the

7  clinician a drawing of an ax with the words "Kill," "Hate," and "Violence" written down."  (Tr. 237-38).

8       On October 31, 2002, Guerin was evaluated by R. Shafor, M.D. ("Dr. Shafor"), at the San Diego

9  Sleep Disorder Center.  (Tr. 165).  Plaintiff reported a one-year history of generalized seizures.  He

10  claimed to be compliant with Dilantin.  Plaintiff stated that he was in rehabilitation for alcohol abuse and

11  had been alcohol-free for two or three months.  Guerin's generalized seizures were related to his alcohol

12  abuse.

13       On November 13, 2002, Plaintiff was examined by Edwin Yager, Ph. D. ("Dr. Yager"), a

14  psychologist.  (Tr. 160-62).  Plaintiff appeared friendly and maintained good eye contact.  His speech

15  was mildly slurred.  He denied drug or alcohol abuse.  Plaintiff reported a "dual diagnosis" of

16  schizophrenia and possible bipolar disorder with chronic anxiety and some obsessive-compulsive

17  symptoms.  He complained of severe and frequent panic attacks, frequent auditory hallucinations, less

18  severe visual hallucinations, severe phobias, and described several suicide attempts.  (Tr. 160-61).

19       Dr. Yager administered a series of psychological tests.  Plaintiff completed the Bender-Gestalt

20  test "almost without a flaw."  (Tr. 161).  He scored low on the WAIS-R test, which was strongly

21  suggestive of organicity.  *Id.*  He claimed to be unable to spell the word "world" forwards or backwards,

22  but was able to count to 20 both forwards and backwards, and to recite the alphabet without error and in

23  rapid order.  He correctly computed 3x7 + 9/10 without a pencil.  *Id.*  According to Dr. Yager, it was

24  unclear whether Plaintiff's performance was compromised by his inability or unwillingness to exert

25  effort to perform.  *Id.*  Dr. Yager noted that compromised memory, attention, and concentration were

26  "mildly evident" in the performance and confirmed by the WMS test and the performance sub-tests of

27  the WAIS-R.  *Id.*

28  --------

[2]Ethanol.

06cv1183

1    The WAIS-R test showed a visual IQ of 92, and full scale of 94. Dr. Yager interpreted the scores

2  as indicative of mildly impaired attention and concentration with "strong indication of not-clearly-

3  defined organicity ... possible drug abuse associated with patchy performance." (Tr. 162). The WMS

4  results were consistent with memory capability above the average, with compromised ability to maintain

5  attention. (Tr. 162).

6    On January 17, 2003, Plaintiff was evaluated by Elliot Feigenbaum, M.D. ("Dr. Feigenbaum"), a

7  board-certified psychiatrist. Dr. Feigenbaum reviewed Plaintiff's medical records. The psychiatrist

8  noted a substance addiction disorder, organic mental disorder and affective disorder. (Tr. 166). He

9  found mild restrictions on Plaintiff's activities of daily living; moderate difficulties in maintaining social

10  functioning; moderate difficulties in maintaining concentration, persistence or pace; and one or two

11  episodes of decompensation. (Tr. 176). Dr. Feigenbaum concluded that Plaintiff could perform simple,

12  repetitive tasks; would have some problems with concentration, but "unremarkable" issues with

13  persistence and pace; would have some difficulty responding to criticism and interacting with others, but

14  would be able to function in a job with minimal stress or supervision; and would have problems

15  adjusting to work stresses and changes in environment, but would function in an environment without

16  deadlines. (Tr. 185).

17    On May 2, 2003, Dr. Feigenbaum's findings were confirmed by Robert B. Paxton, M.D. ("Dr.

18  Paxton"), a board-certified psychiatrist. Dr. Paxton also based his assessment on an independent review

19  of Guerin's records.

20    On December 9, 2002, at the Gifford Clinic, Plaintiff was diagnosed[3] with ETOH dependency in

21  early stage of remission, OCD provisional, panic disorder, and ASDO provisional. (Tr. 235). Guerin's

22  GAF was assessed at 37. *Id.* The mental examination showed "extremely vague and abstract thought

23  processes, constantly shifting body position, intermittent eye contact, anxious and angry mood and affect

24  and slightly constricted affect." *Id.* Plaintiff had intrusive thoughts of violence with suicidal and

25  homicidal ideation without a specific plan or victim. *Id.*

26  ////

27  ////

28

[3]It appears that these diagnoses were made by a clinician, and not a medical doctor.

1    On December 13, 2002, Plaintiff was diagnosed[4] with schizophrenia. (Tr. 234). His GAF was
2    noted as 41. *Id.* Plaintiff's affect was euthymic, but blunted and constricted in range. *Id.* His thought
3    process was logical and goal-directed; his thought content reflective; insight and judgment appeared
4    intact. *Id.*

5    On December 16, 2002, Plaintiff was assessed with OCD provisional; psychotic D/S NOS; and
6    ETOH dependency in early stage of remission. (Tr. 233). His GAF was reported as 38. (Tr. 233). The
7    mental examination showed intrusive violent thoughts; Guerin tapped his foot, stood up and paced while
8    reading the notes he had made during the week; his mood was angry and anxious; his affect was
9    congruent with his mood; his thought process was non-linear, metaphorical and abstract; he had passive
10   suicidal and homicidal thoughts; and his insight and judgment were poor. *Id.*

11   Plaintiff missed the next appointment. On January 6, 2003, the clinician was informed by the
12   operator of the board and care facility, where Plaintiff lived, that Plaintiff had begun drinking again. (Tr.
13   230). On January 15, 2003, Plaintiff's treating physician at the Gifford Clinic, Dr. Driscoll, spoke to
14   him on the phone. (Tr. 228). Guerin admitted to relapsing into alcohol usage, was depressed and
15   admitted that he had not been taking his medication regularly. *Id.* Plaintiff committed to returning to
16   the clinic and taking his medication. *Id.*

17   Plaintiff missed his January 27, 2003 appointment, but called his psychologist, Dr. Goodman.
18   (Tr. 227). Dr. Goodman diagnosed Plaintiff with psychosis NOS R/O ETOH induced; and R/O OCD.
19   *Id.* She noted that his speech was rapid; his thought process more linear and concrete than previously;
20   and not tangential. *Id.* Dr. Goodman commented that Plaintiff could benefit from the dual diagnosis
21   program. *Id.*

22   Plaintiff was late for his March 17, 2003 appointment. (Tr. 226). Dr. Goodman found him
23   slightly agitated and restless with a restricted mood and vague, abstract, metaphorical thought processes.
24   *Id.* His insight and judgment were fair. *Id.*

25   On March 18, 2003, Plaintiff started seeing Christopher Rich ("Dr. Rich"), a non-board certified
26   psychiatrist. (Tr. 29, 225). Dr. Driscoll had left the Gifford Clinic. (Tr. 226). Plaintiff stated that he
27   had not been drinking ETOH since January 2003. (Tr. 225). Daily auditory hallucinations continued.

28

---

[4]It appears that this diagnosis was made by a clinician, and not a medical doctor.

06cv1183

1   *Id.* Dr. Rich observed poor speech, linear thought process and stable mood on that date. *Id.* Dr. Rich

2   doubled Plaintiff's dosage of Resperdal to 2 mg. *Id.* The physician diagnosed Plaintiff with ETOH

3   dependency with a question mark because Plaintiff had not drunk since January; mood disorder, and

4   psychosis NOS. *Id.* Plaintiff was told to abstain from alcohol.

5          Dr. Rich saw Plaintiff again on April 10, 2003. (Tr. 221). Dr. Rich diagnosed Guerin with

6   ETOH dependency in early full remission, depression NOS, psychosis NOS, and found a GAF score of

7   45. *Id.* Plaintiff mentioned that his mother was institutionalized, and his brother suffered from a bipolar

8   disorder. *Id.* Guerin denied ETOH or drug use. *Id.* A mental status examination found poor eye

9   contact, monotone speech, down mood, flat affect and auditory hallucinations. *Id.* Dr. Rich prescribed

10  taking Resperdal more often, and increased the Depakote dosage from 500 mg to 750 mg. *Id.*

11  Plaintiff was also treated by Denise Gonzalez, M.D. ("Dr. Gonzalez"), a board certified internist, at the

12  Imperial Beach Health Center in August - September 2002. (Tr. 150-59). Plaintiff reported suffering

13  from beer binge drinking. (Tr. 155). Dr. Gonzalez recited Plaintiff's history of seizures, but never

14  observed a seizure. She noted that Guerin's last reported seizure occurred in August 2002. Dr.

15  Gonzalez suspected that the seizures were secondary to alcohol withdrawal.

16         On April 10, 2003, Plaintiff reported difficulties with daily auditory hallucinations. Guerin

17  denied alcohol or drug use. He failed to increase his dose of Resperdal against the instructions received

18  during his last visit. He was again instructed to increase Resperdal and Depakote. (Tr. 221).

19         On April 14, 2003, Plaintiff reported continued auditory hallucinations described as

20  "commotions or arguments," and complained of intrusive destructive thoughts. He refused to take

21  increased dosages of his medications, claiming that the medications were not working. (Tr. 22).

22         On June 2, 2003, the clinician at the Gifford Clinic reported that Plaintiff had missed three

23  appointments in a row and had not responded to letters from the clinic. (Tr. 22). Plaintiff had also been

24  inconsistent in his attendance of the individual and group therapy sessions. The clinician recommended

25  that Plaintiff be discharged from counseling and be seen for medication management only. *Id.* The

26  clinician also opined that Plaintiff was an "inconsistent reporter of medication adherence and of

27  [alcohol] sobriety and thus it was difficult to accurately assess the efficacy of his treatment and etiology

28  of his continued problems." *Id.* Dr. Goodman agreed with this opinion. *Id.*

1         On September 12, 2003, Plaintiff was placed on a 72-hour hold at Scripps Mercy Hospital

2  because he was considered a danger to himself.  Plaintiff had overdosed on Resperdal.  (Tr. 359).

3  Plaintiff also admitted to drinking in the few preceding days.  Guerin claimed that he was drinking only

4  small amounts of beer, but his blood alcohol level was 0.11.  He remained hospitalized through

5  September 25, 2003.  Plaintiff significantly improved over the course of hospitalization with group

6  therapy and medication.  Plaintiff's discharge diagnoses were schizoaffective disorder, bipolar type; and

7  alcohol dependence.  Guerin was "quite stable" on discharge.  *Id.*

8         On October 31, 2003, Plaintiff was hospitalized again at Scripps Mercy Hospital.  (Tr. 348).

9  Plaintiff had a medically witnessed tonic-clonic seizure in the emergency room.  Guerin smelled of

10  alcohol and was acutely intoxicated on admission.  His Dilantin level was reportedly subtherapeutic.

11  The CAT scan of the head was again negative.  Plaintiff was discharged in stable condition on

12  November 2, 2003.  His discharge diagnoses were alcohol-induced seizures, bipolar disorder, and

13  alcohol abuse.  His seizures were reportedly related to alcohol withdrawal and non-compliance with

14  medication.

15         On November 7, 2003, Guerin was again hospitalized at Scripps Mercy Hospital after overdosing

16  on Zyprexa and Zoloft.  (Tr. 22).  He claimed to have been abstinent from alcohol for the past month, but

17  his blood alcohol level was 0.8 the preceding week.  He was discharged on November 19, 2003, with the

18  diagnoses of schizoaffective disorder, bipolar type, and alcohol dependence, in remission.

19         From January 26, 2004, through February 12, 2004, Plaintiff was hospitalized once again at

20  Scripps Mercy Hospital.  (Tr. 318).  He complained of suicidal ideation, auditory hallucinations, and

21  paranoid ideation after relapsing on alcohol.  Guerin admitted that he had thrown out all of his

22  medications because of fear of overdosing on them.  Electroconvulsive ("ECT") therapy was initiated,

23  but discontinued because Plaintiff refused to address his substance abuse.  By the time of discharge,

24  Guerin's GAF was 50.  His discharge diagnoses were schizoaffective disorder, depressed type, per

25  patient's report; and alcohol dependence in early remission.  Plaintiff "completely denied that a sober

26  living environment was appropriate," and also "denied the fact that each of his prior hospitalizations

27  have been within the context of acute alcohol intoxication."  (Tr. 319).

28         On June 19, 2004, Plaintiff went to the emergency room at Scripps Mercy Hospital complaining

1    of hearing voices which told him to kill himself and disembowel his brother. (Tr. 303). Plaintiff

2    admitted that he had not been taking his medications regularly for the past two months. He was placed

3    on a 5150 hold as a danger to himself and others, and later transferred to the psychiatric care unit.

4    Plaintiff stated he had been drinking two quarts of beer every other day for the past two months, but

5    claimed he had not consumed any alcohol for the past 12 hours. His blood alcohol level was 0.25.

6    Despite the normal CAT scans and EEGs, the emergency medicine specialist noted that Plaintiff had a

7    seizure disorder unrelated to alcohol withdrawal or use. Plaintiff's medications were adjusted, and he

8    responded well. Plaintiff was discharged with the GAF of 50 and diagnoses of schizoaffective disorder

9    of depressed type and alcohol dependence, continuous.

10          On November 19, 2004, Plaintiff came to the UCSD Medical Center, actively hallucinating and

11   very disoriented. (Tr. 396-421). He had been non-compliant with his medications. On admission,

12   Plaintiff had probable alcohol withdrawal seizures and delirium tremens. Plaintiff was discharged to the

13   County Mental Health on November 20, 2004. It was opined that the reason for non-compliance with

14   the anti-seizure medication were Plaintiff's psychotic and affective disorders. The ALJ noted that the

15   UCSD was apparently unaware of Plaintiff's long history of alcohol abuse. (Tr. 24).

16          From November 20, 2004, through November 30, 2004, Plaintiff was treated at the San Diego

17   County Psychiatric Hospital under a 5150 hold as a danger to himself. (Tr. 438-40). Plaintiff's "chief

18   complaint" to Mary Ann Renzi, M.D. ("Dr. Renzi"), a board-certified psychiatrist, on his arrival was "I

19   want to see what I have to do to get on SSI." Dr. Renzi diagnosed alcohol dependence. She ruled out a

20   psychotic disorder versus malingering.

21          During his hospitalization at the County Psychiatric Hospital, Plaintiff admitted that he not been

22   taking his medications. Over the course of hospitalization, he improved significantly. By the time of the

23   discharge, Plaintiff was oriented and could satisfactorily perform his activities of daily living. The

24   complaints of auditory hallucinations had progressively improved, and there was no evidence of visual

25   hallucinations. The discharge diagnoses were psychotic disorder, NOS, and alcohol dependence. The

26   GAF score was 45. The prognosis was dependent on medication compliance and abstinence from

27   alcohol.

28          Following the discharge from the County Psychiatric Hospital, Plaintiff was seen as an outpatient

1   by Brian Bromley, D.O. ("Dr. Bromley"), a non-board-certified psychiatrist, at the County Mental Health

2   on December 30, 2004. (Tr. 422-27). Plaintiff reported to be under the care of Dr. Irwin at UCSD, but

3   there were no records of this physician's existence. Plaintiff stated that he had a history of hallucinations

4   and seizures, "even in the absence of ongoing alcohol use." Dr. Bromley noted that Plaintiff was in

5   "substantial denial of the importance of his alcoholism." The mental status examination was

6   unremarkable. Dr. Bromley diagnosed a bipolar disorder and alcohol dependence. He encouraged

7   Plaintiff to attend a 12-step alcohol recovery program.

8        **B.**     **The Administrative Hearing**

9       Plaintiff testified at the hearing as follows. (Tr. 449-503). He described his past work. The

10   work was then classified by the testifying vocational expert as that of a maintenance laborer, masonry

11   carrier, construction worker, warehouse worker, and book repairer. (Tr. 34). Plaintiff stopped working

12   in March 2002 because he started having problems with concentration. (Tr. 469, 502). Plaintiff had last

13   drunk a month before the hearing. (Tr. 485). His longest period of sustained sobriety was

14   approximately a month. (Tr. 487). Plaintiff had attended Alcoholics Anonymous in the past. He was

15   living at a board and care facility, offered through the REACH program. (Tr. 490-93).

16       The vocational expert testified that Plaintiff could not perform any of his past relevant work. (Tr.

17   35). Plaintiff's past work was classified as very heavy, heavy or medium. *Id.* The vocational expert

18   testified that based on Plaintiff's residual functional capacity, he could perform jobs existing in

19   significant numbers in the national economy. The example given was the job of an automatic machine

20   operator. (Tr. 35).

21       Victor Frank, a friend of Plaintiff's, completed a third party questionnaire. (Tr. 114). The

22   questionnaire was also considered in the ALJ's decision. Mr. Frank stated that Plaintiff talked to

23   himself, walked in circles, and was sometimes moody. (Tr. 118). He noted that Guerin had "a real bad

24   time remembering times and dates," and had difficulty finding things. (Tr. 115, 118). Mr. Frank stated,

25   however, that when Plaintiff was assigned a task, Plaintiff did it "well." (Tr. 118).

26        **C.**     **The ALJ's Findings**

27       The Social Security regulations set forth a five-step sequential evaluation process for determining

28   whether a claimant has established her eligibility for benefits. *See* 20 C.F.R. § 404.1520. First, the ALJ

1  must determine whether the claimant is engaged in substantial gainful activity. *See* 20 C.F.R. §
2  404.1520(b).  If not, the ALJ then must determine whether the claimant's impairments are "severe"
3  within the meaning of the regulations. *See* 20 C.F.R. § 404.1520(c).  If the impairments are "severe,"
4  then the ALJ must compare the claimant's impairments to the impairments listed in the "Listing of
5  Impairments" set forth in Appendix 1 to 20 C.F.R. § 404. *See* 20 C.F.R. § 404.1520(d).  If any "severe"
6  impairment equals a listed impairment, the claimant must be found to be disabled. However, if a
7  "severe" impairment does not equal a listed impairment, the ALJ must determine the claimant's residual
8  functional capacity.  If the claimant retains the capacity to perform his or her past relevant work, the
9  claimant is not disabled. *See* 20 C.F.R. § 404.1520(f).  If the ALJ determines that the claimant can no
10  longer perform past relevant work, the ALJ must consider whether the claimant can perform other work
11  in the national economy. *See* 20 C.F.R. § 404.1520(g).  If the claimant can perform other work in the
12  national economy, then the claimant may not be found to be disabled. *Id.*; *see also Batson v.*
13  *Commissioner of Social Security Administration,* 359 F.3d 1190, 1193-94 (9th Cir. 2004).

14       In his written decision, the ALJ found as follows.  Plaintiff had several medically determinable
15  impairments that in combination are considered severe: alcohol-withdrawal seizure disorder;
16  schizophrenia, versus psychotic disorder NOS, versus bipolar disorder, versus depressive disorder NOS;
17  and continuing alcohol dependence.  (Tr. 25).  Plaintiff's impairments, alone or in combination, both
18  with and without drug addiction and alcoholism included in the assessment, did not meet or equal any of
19  the listed impairments.  (Tr. 37).  Guerin had moderate restrictions in the activities of daily living;
20  moderate difficulties in maintaining social functioning; moderate difficulties in maintaining
21  concentration, persistence, or pace and, prior to March 31, 2004, had not had more than three
22  documented episodes of decompensation of extended duration.  (Tr. 37).

23       Plaintiff, both with and without his drug addiction and alcoholism, retained the residual
24  functional capacity to perform work activity at the medium level, with certain non-exertional limitations.
25  (Tr. 26, 37).  Plaintiff was limited to never climbing any ladders, ropes or scaffolds except in an
26  emergency; avoiding even moderate exposure to dangerous moving machinery, electric shock, radiation
27  and unprotected heights; avoiding even moderate exposure to extreme heat; and mentally limited to
28  unskilled work with minimal stress and no close or frequent interpersonal contact with supervisors, co-

06cv1183

1   workers, or the public.  (Tr. 26-27, 37).

2        Plaintiff was unable to perform his past relevant work.  (Tr. 37).  Plaintiff could perform jobs

3   existing in significant numbers in the national economy, *e.g.,* that of an automatic machine operator.

4   (Tr. 38).  Plaintiff was therefore not under a disability.  *Id.*

5                                **III.  LEGAL STANDARD**

6        The Commissioner's decision must be affirmed if supported by "substantial evidence," and if the

7   Commissioner applied the correct legal standards.  *Batson*, 359 F.3d at 1193; *Connett v. Barnhart*, 340

8   F.3d 871, 873 (9th Cir. 2003).  "Substantial evidence" is "more than a mere scintilla but not necessarily

9   a preponderance."  *Connett*, 340 F.3d at 873.  Under this standard, the Commissioner's findings are

10  upheld if supported by inferences reasonably drawn from the record.  *See Gallant v. Heckler,* 753 F.2d

11  1450, 1452-53 (9th Cir. 1984).  If evidence exists to support more than one rational interpretation, the

12  Court must defer to the Commissioner's decision.  *See Morgan v. Commissioner of Social Sec. Admin.,*

13  169 F.3d 595, 599 (9th Cir. 1999).

14                                  **IV.  DISCUSSION**

15       In his motion for summary judgment, Plaintiff argues that (1) the ALJ failed to determine

16  whether Plaintiff's drug and/or alcohol addictions were material to Plaintiff's disability; (2) the ALJ

17  improperly found that Dr. Rich was not Plaintiff's treating physician; (3) the ALJ failed to provide the

18  specific and legitimate reasons for rejecting the assessment of Plaintiff's treating physician; and (4) the

19  ALJ failed to specify the evidence in support of his findings of Plaintiff's functional restrictions.

20  Defendant moves for summary judgment on the same three issues.  The Court will address each issue in

21  turn.

22       **A.        Addiction Materiality Analysis**

23       The ALJ did not err when he did not determine whether Plaintiff's drug addiction and alcoholism

24  ("DA & A") were material to Plaintiff's disability because no disability was found.

25       A determination of the materiality of the addiction is necessary when there is a finding of a

26  disability.  "A finding of "disabled" under the five-step inquiry does not automatically qualify a claimant

27  for disability benefits."  *Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).  An "individual

28  shall not be considered to be disabled for purposes of [benefits under Title II or XVI of the Act] if

                                          11                                    06cv1183

1   alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the

2   Commissioner's determination that the individual is disabled." 42 U.S.C. §§ 423(d)(2)(C),

3   1382c(a)(3)(J); *see also Sousa v. Callahan,* 143 F.3d 1240, 1242 (9th Cir. 1998). If the ALJ finds that

4   the claimant is disabled and there is "medical evidence of [his or her] drug addiction or alcoholism,"

5   then the ALJ should proceed under §§ 404.1535 or 416.935 to determine if the claimant "would still [be

6   found] disabled if [he or she] stopped using alcohol or drugs." *Bustamante,* 262 F.3d at 955 (citing 20

7   C.F.R. §§ 404.1535, 416.935). It is improper for the ALJ to determine the impact of the addiction on the

8   other mental impairments prior to completing the five-step inquiry. *Bustamante,* 262 F.3d at 955.

9        The ALJ found that Plaintiff was not disabled. Contrary to Plaintiff's argument, the ALJ did not

10  separate out the impact of the DA & A before reaching his finding. The ALJ discussed the mental

11  impairments related to Plaintiff's DA & A in detail throughout the entire decision. These impairments

12  were included in every step of the analysis. The ALJ concluded that Plaintiff's impairments did not

13  meet or equal any listed impairments "both with and without drug addiction and alcoholism (DA & A)

14  included in the assessment." (Tr. 37). He also concluded that "both with and without drug addiction

15  and alcoholism (DA & A) included in the assessment," the claimant retained certain residual functional

16  capacity. *Id.*

17        Plaintiff claims that the above language in the ALJ's decision indicates that Plaintiff's

18  alcoholism was material regardless of whether Plaintiff was found disabled or not disabled. The ALJ,

19  however, specifically stated that Plaintiff's impairments did not equal the listed impairments with the

20  DA & A included in the assessment. When a claimant is not found disabled with the DA & A included

21  in the assessment, it only follows that the same claimant will not be found disabled if the DA & A are

22  excluded from the assessment. The latter scenario simply presents an individual with fewer

23  impairments.

24        Plaintiff cites the following comment made by the ALJ:

25        If Dr. Rich's assessment of "repeated episodes of decompensation, each of extended duration"
           were supported by the record, claimant might meet a mental listing, but it is not supported and

26        even if it were, alcoholism would clearly be a factor material to any resulting finding of
           disability.

27

28  (Tr. 26). This paragraph does not show that the ALJ separated Plaintiff's DA & A out of his analysis

    before reaching the finding of no disability. The ALJ found that the assessment of episodes of

1   decompensation is not supported by the record.[5] Therefore the ALJ's analysis rested on the lack of

2   evidence in support of an impairment serious enough to equal a mental listing. In the absence of such

3   evidence, the ALJ properly concluded that Plaintiff impairment did not equal a listed impairment. The

4   ALJ's comment that alcoholism would be a material factor if Plaintiff's mental impairment did equal a

5   listed one does not render the analysis improper. If Plaintiff indeed had an impairment which equaled a

6   listed one, then a disability may have been found, and the materiality analysis conducted. Because no

7   disability was ever found, Plaintiff's argument is speculative.

8        Plaintiff's citation to another paragraph of the ALJ's decision is similarly speculative. The ALJ

9   noted:

10       If the issue of materiality of DA & A had arisen in this case, I would find that alcoholism is
         "material," agreeing with Dr. Paxton that alcohol abuse is certainly "a major factor," and with
11       Dr. Goodman that the claimant has never stopped drinking long enough to know what his mental
         condition might be if he did.
12

13   (Tr. 36). The ALJ commented that had the materiality issue arisen, alcoholism would have been found a

14   material factor. This comment merely describes the outcome of a hypothetical inquiry which never

15   actually occurred. The issue of mareriality never arose because no disability was ever found. The

16   mention of this possibility, however, does not result in the DA & A being removed from the initial

17   disability determination.

18       Finally, Plaintiff's reliance on *Lindsay v. Barnhart*, 370 F.Supp.2d 1036, 1043 (C.D. Cal. 2005),

19   is misplaced. The ALJ in *Lindsay* found, at step three, that *"[a]bsent* the claimant's alcohol abuse,

20   [his] medically determinable impairments have never met or medically equaled one of the listed

21   impairments...." *Lindsay*, 370 F.Supp.2d at 1043 (emphasis added). The ALJ in the present action never

22   deducted Plaintiff's DA & A from the equation. Th ALJ specifically stated that Plaintiff's impairments

23   do not meet the listed impairments both with and without the DA & A. (Tr. 37).

24       Because Plaintiff's DA & A were not removed from the analysis and no disability was found, the

25   ALJ was not required to determine whether the DA & A were a material factor in the disability.

26   Therefore the ALJ did not commit legal error.

27

28       [5]Plaintiff does not provide any proof that Dr. Rich's assessment regarding episodes of
         decompensation is supported by the record.

13                                                                                          06cv1183

**B.     Dr. Rich's Role in Plaintiff's Medical History**

The ALJ did not err in finding that Dr. Rich was not a treating physician.  The applicable regulations provide:

> Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s).

20 C.F.R. § 404.1502.

A psychiatrist may be considered a treating source even when he is only "responsible for prescribing and monitoring medication, but leave[s] most of the direct patient contact to others within a treatment team," when consistent with the "emerging patterns of medical treatment." *Benton ex rel. Benton v. Barnhart,* 331 F.3d 1030, 1041 (9th Cir. 2003).

The ALJ evaluated Dr. Rich's opinions as those of an examining physician, "because [Dr. Rich] did not see the claimant long enough or frequently enough to have formed the kind of relationship that entitles the opinions of treating physicians to special deference." (Tr. 29).  Dr. Rich saw Plaintiff three times at the Gifford Clinic: on April 10, 2003; April 18, 2003; and June 4, 2003.  Moreover, of these three times, Dr. Rich only saw Plaintiff twice before he issued his opinion on Plaintiff's functional limitations.  By contrast, the psychiatrist in *Benton* oversaw the care of the claimant from November 1997 until at least January 1999.  *See Benton,* 331 F.3d at 1034.  Further, Guerin was seen by a number of different physicians over the relevant period of time, including several at the Gifford Clinic.  The psychiatrist in *Benton* was the plaintiff's assigned specialist at Kaiser Permanente.  Finally, Dr. Rich never ordered any psychological testing or reported any clinical findings from formal clinical testing on mental status examination.  (Tr. 29).

Plaintiff points to the notes of the clinician at the Gifford Clinic regarding who would "take on" Plaintiff's care once Dr. Driscoll left. (Tr. 226).  "Taking on" a patient care after the previous doctor left does not necessarily result in a treating source relationship.  The relationship is formed over a period of

1    time.[6] Dr. Rich saw Plaintiff three times over a period of three months, and only twice before the

2    findings at issue were made. In addition, Dr. Rich was one of the numerous psychiatrists who examined

3    Plaintiff. Therefore there is substantial evidence in the record to support the ALJ's decision that Dr.

4    Rich's relationship with Plaintiff was not that of a treating physician.

5         **C.**      **The ALJ's Treatment of Dr. Rich's Findings**

6        Even assuming that Dr. Rich were a treating physician, the ALJ provided specific and legitimate

7    reasons for discounting Dr. Rich's opinion. The ALJ may disregard the treating or examining

8    physician's opinion, whether or not that opinion is contradicted. *See Magallanes v. Bowen,* 881 F.2d

9    747, 751 (9th Cir. 1989). When contradicted by other evidence, the treating physician's opinion may be

10    disregarded by the ALJ only for "specific and legitimate reasons supported by substantial evidence in the

11    record." *Lester v. Chater,* 81 F.3d 821, 830 (9th Cir. 1995).

12        In his April 16, 2003 assessment, Dr. Rich diagnosed alcohol dependence in early full remission;

13    depressive disorder, NOS, and psychotic disorder, NOS. (Tr. 29). He also indicated that Plaintiff had

14    "repeated episodes of decompensation, each of extended duration." *Id.* Dr. Rich also noted that Plaintiff

15    would miss more than three days of work per month due to "impairments or treatment." *Id.*

16        As discussed below, Dr. Rich's opinion was contradicted by the other evidence in the record.

17    The ALJ gave sufficient reasons for discounting Dr. Rich's opinion. Dr. Rich never ordered any

18    psychological testing or reported any clinical findings from formal clinical testing on mental status

19    examination, such as objects remembered after delay, serial sevens, or digit span. (Tr. 29). Dr. Rich

20    "obviously accepted" at face value Plaintiff's self-reports of history and symptomatology, "since he

21    diagnosed [Plaintiff's] alcoholism as being in full remission." *Id.* On March 18, 2003, Plaintiff told Dr.

22    Rich that Plaintiff took his medication as scheduled and had been abstinent from alcohol since January

23    2003. One day earlier, however, Dr. Goodman noted that Plaintiff had been "so inconsistent in his

24    reports of adherence (to medication) and of drinking," that his actual history was "not clear" as to

25    medication compliance or sobriety. *Id.* Plaintiff made repeated claims of abstinence inconsistent with

26    his ongoing alcohol abuse. *Id.*

27

28      [6]Plaintiff also argues that Dr. Rich was his treating physician because Dr. Rich "was employed to cure him and manage his care." (Pl.'s P. & A. in Sup. of Pl.'s Mot. for Sum J., 19:18-19). Being employed "to cure" someone does not result in an instant treating physician relationship any more than instantly curing the patient, as evidenced by Plaintiff's case.

06cv1183

1    Dr. Goodman discharged Plaintiff from counseling services because he had been inconsistent in

2  his reports of medication compliance and sobriety. *Id.* The discharge occurred two days before Dr. Rich

3  signed the functional assessment. *Id.* The ALJ concluded, "[c]learly, Dr. Rich's uncritical acceptance of

4  what the claimant told him is not supportable on the record in this case." *Id.*

5    Further, the ALJ noted Dr. Rich's opinion that Plaintiff would miss a lot of work. (Tr. 30).

6  When Dr. Rich saw Guerin on June 4, 2003, Guerin had missed all of his previous appointments since

7  April 28, 2003. Plaintiff, however, explained that the reason for the absences was transportation

8  problems, not "impairments or treatment." (Tr. 30). The vocational expert testified that even if Plaintiff

9  were to miss more than three days per month, sustained employment would not be precluded if the

10  absences were medically excused. *Id.* The ALJ accepted this testimony. *Id.*

11    Plaintiff points out that Dr. Feigenbaum opined that Plaintiff would suffer one or two episodes of

12  decompensation. (Tr. 176). Dr. Feigenbaum found mild restrictions on Plaintiff's activities of daily

13  living and moderate difficulties in maintaining social functioning, concentration, persistence or pace.

14  (Tr. 176). These findings, however, are not as restrictive as Dr. Rich's.

15    The record shows that Plaintiff continued to abuse alcohol while denying it to Dr. Rich. Dr. Rich

16  accepted Plaintiff's denial and apparently relied on it in his assessment. Based on the record, the ALJ's

17  reasons in assigning less weight to Dr. Rich's opinion were specific and legitimate.

18    In addition, Dr. Rich's assessment was not supported by clinical findings. "The ALJ need not

19  accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory,

20  and inadequately supported by clinical findings." *Thomas v. Barnhart,* 278 F.3d 947, 957 (9th Cir.

21  2002). Dr. Rich conducted a mental status examination. As noted before, however, Dr. Rich never

22  ordered any psychological testing or reported any clinical findings from formal clinical testing on mental

23  status examination, such as objects remembered after delay, serial sevens, or digit span. (Tr. 29).

24    Accordingly, there is substantial evidence to support the ALJ's rejection of Dr. Rich's

25  assessment.

26    **D.    The ALJ's Findings Regarding Plaintiff's Functional Limitations**

27    The ALJ's findings regarding Plaintiff's functional limitations are supported by substantial

28  evidence. Plaintiff argues that these findings should be reversed because the ALJ did not specify the

    evidence in their support. The applicable regulations set forth a special procedure for evaluating mental

1  impairments:

> In addition to the basic procedural steps of the five-step sequential evaluation process set forth in the regulations at 20 C.F.R. section 404.1520, the regulations provide a special technique to be applied in evaluating the effect of a mental impairment. For purposes of this action, that technique may be summarized in four steps. First, the adjudicator must determine whether, based on the claimant's symptoms, signs, and laboratory findings, the claimant has a "medically determinable mental impairment(s)." 20 C.F.R. § 404.1520a(b)(1). If not, the special technique does not apply. Second, the adjudicator must rate the degree of functional limitation resulting from the impairment in four areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §§ 404.1520a(b)(2), 404.1520a(c). Third, if ratings are predominantly "none" or "mild," the impairment is determined to be not severe. 20 C.F.R. § 404.1520a(d)(1). If the mental impairment is severe, an analysis is undertaken to determine whether it meets or is equivalent to a listed disorder, or if not, what the claimant's residual functional capacity is. 20 C.F.R. §§ 404.1520a(d)(2), 404.1520d(3). Fourth, the written decisions of the ALJ and the Appeals Council must incorporate the findings based on the application of the technique, including a specific finding for each of the functional areas listed in step two. 20 C.F.R. § 404.1520a(e)(2).

*McCarty v. Barnhart*, 2005 WL 5108536, 9 (N.D. Cal. 2005). Prior to September 2000, the ALJ was required to prepare and attach a "Psychiatric Review Technique Form" to his decision. *Gutierrez v. Apfel,* 199 F.3d 1048, 1051 (9th Cir. 2000). The amended regulations, however, allow the ALJ to incorporate the pertinent findings into his decision without attaching the form. *See* 20 C.F.R. § 404.1520a(e)(2)(2006).

The ALJ found that Guerin had several medically determinable impairments that in combination are considered severe: alcohol-withdrawal seizure disorder; schizophrenia, versus psychotic disorder NOS, versus bipolar disorder, versus depressive disorder NOS; and continuing alcohol dependence. (Tr. 25). Plaintiff's impairments, alone or in combination, both with and without drug addiction and alcoholism included in the assessment, did not meet or equal any of the listed impairments. (Tr. 37). Guerin had moderate restrictions in the activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace and, prior to March 31, 2004, had not had more than three documented episodes of decompensation of extended duration. (Tr. 37).

The ALJ's findings are supported by the findings of Drs. Feigenbaum and Paxton, the state agency psychiatrists who reviewed Plaintiff's records. "[T]he findings of a nontreating, nonexamining physician can amount to substantial evidence, so long as other evidence in the record supports those findings." *Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996). "State agency medical and psychological consultants and other program physicians and psychologists are highly qualified physicians and

06cv1183

1   psychologists who are also experts in Social Security disability evaluation." 20 C.F.R. § 404.1527(f).

2          Dr. Feigenbaum found mild restrictions on Plaintiff's activities of daily living; moderate

3   difficulties in maintaining social functioning; moderate difficulties in maintaining concentration,

4   persistence or pace; and one or two episodes of decompensation. (Tr. 176). Dr. Feigenbaum concluded

5   that Plaintiff could perform simple, repetitive tasks; would have some problems with concentration, but

6   "unremarkable" issues with persistence and pace; would have some difficulty responding to criticism

7   and interacting with others, but would be able to function in a job with minimal stress or supervision;

8   and would have problems adjusting to work stresses and changes in environment, but would function in

9   an environment without deadlines. (Tr. 185). Dr. Feigenbaum's findings were confirmed by Dr. Paxton.

10          The opinions of Dr. Feigenbaum and Dr. Paxton corroborate each other. The ALJ stated that the

11   "opinions of Dr. Feigenbaum and Dr. Paxton are well-supported by the record as a whole, and I give

12   them significant weight." (Tr. 31). Therefore the ALJ's findings regarding Plaintiff's functional

13   limitations were properly incorporated in the written decision and supported by substantial evidence.

## V. CONCLUSION

15          Based on the above, the ALJ's decision was supported by substantial evidence and free of legal

16   error. Accordingly, Plaintiff's motion for summary judgment is **DENIED,** and Defendant's motion for

17   summary judgment is **GRANTED.**

18          **IT IS SO ORDERED.**

20   DATED: _09/11/07_

ROGER T. BENITEZ
United States District Judge

06cv1183